# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

CLYDE DERRICK EDDINGTON,

          Petitioner,

   v.

D. ADAMS, Warden,

          Respondent.

_____/

CV F   06-1770 DLB HC

ORDER DENYING PETITION FOR WRIT OF
HABEAS CORPUS, DIRECTING CLERK OF
COURT TO ENTER JUDGMENT IN FAVOR
OF RESPONDENT, AND DECLINING TO
ISSUE CERTIFICATE OF APPEALABILITY

[Doc. 1]

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the United States Magistrate Judge.

BACKGROUND[1]

On February 18, 2004, the District Attorney of Kern County filed an amended information charging Petitioner and co-defendant Ellis Stafford as follows: in count one[2] Petitioner and Stafford were charged with assault with a deadly weapon (Cal. Penal Code §

---

[1] This information is derived from the petition for writ of habeas corpus, Respondent's answer to the petition, and Petitioner's traverse.

[2] As Respondent correctly points out, in the original information, Petitioner was charged in count one with attempted murder (Cal Penal Code §§ 664/187(a)), and counts two through five of the original information corresponded with counts one through four, respectively, of the amended information. On December 2, 2003, count one was dismissed. (CT 132-133.) Following the dismissal of count one, the trial court's records continued to identify the charges as outlined in the original information despite the fact that the amended information renumbered the counts. Thus, at times in the record, the assault with a deadly weapon charge in count one of the amended information is referred to as count two, the discharging of a firearm from a vehicle is referred to as count four, and the felon in possession of a firearm charge is referred to as count five. (CT 331-332; POR 13-14.)

1

245(a)(1); in count two, Stafford was charged with knowingly permitting another person to discharge a firearm from a vehicle (Cal. Penal Code § 12034(b)); in count three, Petitioner was charged with discharging a firearm from a vehicle (Cal. Penal Code § 12034(c)), and in count four, Petitioner and Stafford were charged with being convicted felons in possession of a firearm (Cal. Penal Code § 12021(a)(1)).  (CT 175-180).

In addition, the information alleged, as to count one, that Petitioner used a firearm during the commission of the offense (Cal. Penal Code § 12022.5(a)(1)); that Petitioner and Stafford committed the crime for the benefit of a criminal street gang and with the intent to promote the street gang (Cal. Penal Code § 186.22(b)(1)); and that Petitioner served a prior prison term (Cal. Penal Code § 667.5(b)).  In count two, a street gang enhancement and a prior prison term enhancement were alleged as to Stafford; and in count three, a street gang enhancement was alleged against Petitioner.  Count four alleged prior prison term enhancements as to Petitioner and Stafford.  (CT 175-180.)

Following jury trial in the Kern County Superior Court, Petitioner was convicted of assault with a deadly weapon, discharging a firearm from a vehicle, and being a felon in possession of a firearm.  In addition, the enhancement allegations were found to be true. Petitioner was originally sentenced to twenty-four years in state prison.

Petitioner filed a timely notice of appeal to the California Court of Appeal, Fifth Appellate District.  On August 3, 2005, the Court of Appeal reversed Petitioner's assault with a firearm conviction (count one) and remanded the matter for resentencing. (Lodged Doc. No. 9.) The judgment was affirmed in all other respects. (Id.)

On August 12, 2005, Petitioner filed a petition for rehearing in the Fifth District Court of Appeal, which was denied on August 16, 2005.  (Lodged Doc. No. 10.)

Petitioner filed a petition for review in the California Supreme Court on September 6, 2005, which was denied on November 16, 2005.  (Lodged Doc. No. 11.)

Resentencing proceedings were held on February 2, 2006, in the Kern County Superior Court, and Petitioner was sentenced to a total of twelve years in state prison.  (Lodged Doc. No. 12.)

1    Petitioner did not file any post-conviction collateral petitions in state court.

2    Petitioner filed the instant petition for writ of habeas corpus on November 17, 2006.

3  Respondent filed an answer to the petition on May 7, 2007, and Petitioner filed a traverse on

4  June 1, 2007.  (Court Docs. 15, 19.)

5                        <u>STATEMENT OF FACTS</u>

6        Around 6:00 or 6:30 p.m. on August 25, 2003, Steve Perry was cleaning
   Leon Anderson's car, which was parked in front of a house on Feliz Drive in
7    southeast Bakersfield.  Anderson and several other people, including [Petitioner]
   and Stafford (who were friends), were standing around in the front yard.  Perry
8    was inside the car when he saw an African-American male, 18 to 20 years old,
   approaching on a bicycle.  The young man was not from the neighborhood.  He
9    stopped in the middle of the street and opened fire.  Perry heard 10 shots.  The
   young man then rode off and headed south on Cottonwood.  Perry saw that
10   Anderson was lying on the ground.  He did not see anyone pursue the shooter.
        Sheriff's deputies were dispatched to the scene.  Deputy Self discovered
11   that Anderson had been shot in the thigh.  Anderson, who had "East Side"
   tattooed on his abdomen, said he did not remember what had happened.  Deputy
12   Ramirez located 10 spent nine-millimeter shell casings in the roadway.  Bullet
   holes were found in a door of the car which Perry had been cleaning and a garbage
13   can, and a bullet was found near one of the houses.
        At approximately 6:44 on the evening in question, Alton Gordon, Pastor
14   John Turner, and some other men were having a meeting inside the Union Baptist
   Church, which is located at the corner of East Belle Terrace and Cottonwood
15   Road, approximately three blocks from the scene of the Feliz Drive shooting.
   They heard gunshots.  A short time later, they heard more gunfire, this time from a
16   slightly different direction.  Turner described seeing a young Black man who was
   running.  The man fell down, then got back up and began to look for something.
17   He then started to run again.  Gordon described seeing a young Black male, in his
   mid to late 20's, in the vacant lot across the street from the church.  He was
18   running in circles and looking down at the ground, as if he was looking for
   something.
19        Brandon Baxter, who was at the house next door to the church, told the
   young man to get down, that somebody was shooting at him, but the person just
20   kept on looking for something.  A second set of shots was fired; as Baxter ducked,
   he saw a light-colored car, possibly a tan Ford LTD, driving by on Cottonwood.
21   Although he did not see anyone with a hand out of the window, firing, he assumed
   this car was the source of the shots.  The young man ran toward Smith Street.
22        Rosalia Constancio was in the back yard of her residence on Smith Street,
   when she heard two sets of gunshots.  One seemed to come from the northwest,
23   which was the direction of the Feliz Drive shooting.  The second seemed to come
   from the area of the church.  Constancio saw a long, cream-colored car go by on
24   Cottonwood Road, headed toward Highway 58.  She also saw a Black male,
   between 16 and 19 years old, running toward her neighbor's house.  He could not
25   get over the fence because of the dog, so then he came onto the front part of
   Constancio's property and hid under a pickup truck.  He asked her to call the
26   police because someone wanted to kill him.  He appeared to be frightened.  He
   had nothing in his hands.
27        Bakersfield Police Officer Heredia responded to the scene and found
   Vertis Bayne hiding behind a car.  Bayne was a 21-year-old Black male who had
28   numerous tattoos, including one that read "CBC."  This is a common tattoo for the

                                    3

1   Country Boy Crips.

2          Bayne came out from behind the car as soon as Heredia exited his patrol
   vehicle.  He was excited, nervous, and sweating.  After determining he was
3   unarmed, Heredia asked what was going on.  Bayne said "they" were shooting at
   him.  Heredia transported him to the church parking lot at East Belle Terrace and
   Cottonwood, where Senior Deputy Lopez took custody of him.  Baxter identified
4   him as the person who had been in the vacant lot.

5          Heredia and his partner then searched the vacant field across from the
   church.  Heredia found a blue mountain bicycle and a gray, semiautomatic nine-
   millimeter Ruger pistol.  The slide was in the locked-back position, indicating that
6   it had been fired until empty, malfunctioned in some manner, or had been placed
   in that position.  There were no bullets in the gun, suggesting it had not
7   malfunctioned.  The pistol would have ejected shell casings as it was fired; none
   were found in the area.  Bayne was arrested for assault with a deadly weapon in
8   connection with the shooting on Feliz Drive.  Laboratory analysis revealed that the
   Ruger was used in the Feliz shooting.  Since the weapon's magazine was capable
9   of holding 10 live cartridges (in addition to which, an 11th round could be placed
   in the chamber), the position of the slide and number of spent casings found at the
10  scene of that shooting were consistent with the gun having been fired until empty.

11         Meanwhile, Bakersfield Police Officer Paslay and his partner, Officer
   Slayton, had heard the sheriff's department's communications concerning the
12  shooting on Feliz and a tan Ford Crown Victoria or Ford LTD.  As they drove
   south on Cottonwood and reached Brundage, they saw a Ford LTD that was "real
13  close" to the description, headed northbound on Cottonwood.  Stafford was
   driving; [Petitioner] was the passenger.  The vehicle turned onto Brundage and
14  then entered the Highway 58 on-ramp.  The officers followed.  About a third of
   the way up the circular on-ramp, an object came out of the passenger-side
15  window.  Paslay and Slayton stopped the LTD near Liggett and Brundage and
   detained Stafford and [Petitioner].

16         Paslay was acquainted with Stafford, who related that he and [Petitioner]
   had been the victims of a shooting which had just occurred on Feliz.  Stafford said
17  he and [Petitioner] had immediately left and gone north on Cottonwood.  This
   struck Paslay as odd, due to the times and distances involved.  Paslay also spoke
18  to [Petitioner], who said he and Stafford had been at a relative's house in the area
   of Del Mar and Madison, which is further southwest. [Petitioner] said they had no
19  knowledge of any shooting on Feliz.

20         Paslay sent Officers Herman and Talbot back to check the area where
   something had come out of the car.  In the dirt adjacent to the on-ramp, Herman
21  found a chrome or stainless-colored .357 revolver with a portion of the serial
   number removed.  There were six spent casings, but no bullets, in the weapon.
   Upon being advised that a gun had been located, Paslay took Stafford and [Petitioner] into
22  custody.  A search of the vehicle, which belonged to Stafford, turned up a live shotgun round in
   the back seat, two gloves of different makes on the front seat, and a fingerless weight-lifting-type
   glove on the front driver's side floorboard.

23         Senior Deputy Lopez brought Bayne to the location, but Bayne said he was
   unsure whether he could identify the occupants or the car because he had been
24  crawling through the field while they were shooting at him.  Lopez subsequently
   transported Baxter to the scene; he positively identified the car as the one that had
25  been involved in the shooting at East Belle Terrace and Cottonwood, although he
   was unable to identify Stafford or [Petitioner] as the vehicle's occupants.

26         Lopez returned a third time to take custody of [Petitioner] and Stafford,
   who admitted to Lopez that he was a member of the East Side Crips gang.
27  [Petitioner] and Stafford were placed in the back seat of Lopez's vehicle and their
   conversation was secretly recorded.  A tape recording of the conversation was
28  played for the jury.  In it, [Petitioner] (who is identified in the transcript of the

                                          4

recording, which was also admitted into evidence, as Male 1) said, "They found the gun." He also told Stafford (who is identified as Male 2) to say that they had come from [Petitioner's] father's residence. Stafford said it was self-defense because "the dude" was shooting at them, then they started shooting at him. [Petitioner] again referred to the gun being found, then told Stafford, "They can't hook me with that gun." He later said that nobody was going to come and identify them, and he informed Stafford that "Leon" was hit in the leg. At one point, [Petitioner] wondered who called the police and said something about a brown LTD, then he and Stafford agreed that the person probably thought they were the ones doing the shooting. [Petitioner] later said that the only thing that looked bad was if they got the .357. Stafford asked, "You didn't get the fingerprints wiped off, huh?" [Petitioner] replied that he did not have time. [Petitioner] said he could not see how the police got "that fool," and that he thought the person was across the way. Stafford replied that he was, but when [Petitioner] "busted" (i.e., shot) at him, he turned around and ran back the other way. Stafford said they needed to come up with something because the police would be talking to them, and he suggested they say they were on Feliz and the other person started shooting. [Petitioner] added that the person started shooting and they just left. Stafford expressed hope that his own prints did not "come up." After further discussion (much of which was unintelligible), [Petitioner] said that if they had gone a different way, they would have had a chance to get out and get somewhere and get rid of the gun.

Officer Paslay, an expert on gangs, testified that as of the date of the shooting, the East Side Crips and County Boy Crips were criminal street gangs. He opined that Bayne was a member of the County Boy Crips, Leon Anderson was the leader of the East Side Crips, and [Petitioner] and Stafford were members of the East Side Crips. He also opined that the crimes of assault with a firearm, shooting from a vehicle, and allowing someone to shoot from the vehicle, were committed in furtherance, for the benefit of, or in association with, the East Side Crips criminal street gang.

[Petitioner] and Stafford each stipulated to being previously convicted of a felony.

**[Defense Case]**

Harlan Hunter, an expert on gangs, examined various reports and information in conjunction with this case with respect to [Petitioner]. In addition, and unlike Paslay, Hunter questioned area residents about [Petitioner], who lived on Feliz. Based on his investigation and the totality of the information, Hunter concluded that [Petitioner] was not a member of a criminal street gang or, specifically, the East Side Crips. Hunter also questioned area residents about Stafford; the people he spoke to considered Stafford and [Petitioner] to be close friends. Stafford cut lawns in the area; as far as the residents were concerned, he did not engage in any gang activities there. Based on the totality of the information, Hunter found nothing to make him believe Stafford was a gang member. However, he believed there was a high probability that Bayne was a member of the County Boy Crips and that Leon Anderson was probably a member of the East Side Crips. Hunter agreed that certain members of the East Side Crips engaged in a pattern of ongoing criminal activity. He also agreed that one factor, in isolation, was an insufficient basis upon which to assess whether someone was a gang member.

Paslay relied, in part, on information that [Petitioner] and Stafford each had claimed to be a member of the East Side Crips for housing purposes when booked into jail. Hunter found such information lacking in reliability due to the discretion a booking officer has in making housing placements. A person might say he was from the east side or from a particular street which was part of a certain gang's territory, and from there the decision might be made to place that

person in certain housing or segregate him from members of a particular gang.

In Hunter's opinion, if one street gang is attacked by another and does not take action in return, the gang will lose face not only with its own membership, but also with its rivals.

[Petitioner] testified in his own behalf. He denied ever being a member of a gang or the East Side Crips, although he admitted knowing some members of that gang inasmuch as he resided on the east side. He was acquainted with Stafford and had heard he was an East Side Crip, but he did not personally know this to be true. According to [Petitioner], the two men worked together off and on, and frequently went fishing together. [Petitioner] sold fish as part of his income.

On the day of the shooting, [Petitioner] had just arrived home when he saw Stafford's car parked in front of his [Petitioner's] house. Stafford was standing in the front yard of the house directly across the street. [Petitioner] went inside his own house, then came back out and went over to join Stafford. Steve Perry and Leon Anderson were there, as well as some other people. [Petitioner] had only known Anderson a short time, and did not know him well.

[Petitioner] had gotten halfway across the street when he caught a glimpse of someone on a bicycle. Shots were fired almost immediately, and [Petitioner] ran to take cover. After the shots were fired, [Petitioner] headed toward his car, which was parked in his driveway. He wanted to get his gun for protection. [Petitioner] obtained his gun, then went back into the street and saw the shooter riding off. [Petitioner]-who had hunted and fished and knew how to shoot-decided he would not fire. He saw that Stafford had jumped into his car and was headed toward the shooter, so [Petitioner] yelled at him and then got into the car. They then followed the assailant. [Petitioner] did not know Stafford's reasons for getting into the car, but [Petitioner] did not want the shooter to get away. He wanted to hold him so he could be caught.

Stafford said something about getting away from there and going to his house, and they headed in that direction. As they passed the field at the corner of Cottonwood and Belle Terrace, [Petitioner] saw the shooter on his bicycle in the field. When the shooter saw them as they were pulling over and slowing down, he dropped the bicycle, then fired a couple of shots at them. One came through the car's open window. [Petitioner] ducked down, then pointed his revolver up in the air and fired three or four times. He thought this might make the other man duck for cover and quit shooting at them. Stafford made a U-turn; as he did, [Petitioner] started to raise up, then heard the man fire another shot. Stafford and [Petitioner] then left. [Petitioner] never aimed at the man because there was a park full of people nearby. [Petitioner] subsequently threw his gun out of the car window because he knew he was not supposed to have it and, given what had just happened, he was scared.

At the time the police stopped the car, [Petitioner] did not know that Anderson had been hit. One of the officers told him, but [Petitioner] said he did not know anything about the shooting. When he and Stafford were placed in the back of Lopez's vehicle, [Petitioner] made statements about saying they came from his father's because he was nervous and thought he was being accused of shooting Anderson. When [Petitioner] made statements about the police being unable to match him to the gun, he was talking about the gun found in the field.

(Lodged Doc. No. 9, at 2-10, fns. omitted.)

///

///

6

1

DISCUSSION

2   A.    Jurisdiction

3          Relief by way of a petition for writ of habeas corpus extends to a person in custody

4   pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

5   or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

6   529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

7   violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

8   out of the Kern County Superior Court, which is located within the jurisdiction of this Court.  28

9   U.S.C. § 2254(a); 2241(d).

10         On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

11  of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

12  enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114

13  F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

14  Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct.

15  1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

16  (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

17  petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

18  B.    Standard of Review

19         This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

20  custody pursuant to the judgment of a State court only on the ground that he is in custody in

21  violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

22         The AEDPA altered the standard of review that a federal habeas court must apply with

23  respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v.

24  Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus

25  will not be granted unless the adjudication of the claim "resulted in a decision that was contrary

26  to, or involved an unreasonable application of, clearly established Federal law, as determined by

27  the Supreme Court of the United States;" or "resulted in a decision that was based on an

28  unreasonable determination of the facts in light of the evidence presented in the State Court

7

proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  Lockyer, at 1175 (citations omitted).  "Rather, that application must be objectively unreasonable."  Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction.  Brecht v. Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

Because the California Supreme Court's opinion is summary in nature, however, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion.  See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under § 2254(d)(1)).

C.    Co-Defendant's Statements

In Grounds One and Two, Petitioner contends that the "testimonial hearsay" statements by codefendant Stafford regarding Petitioner's gang membership violated his constitutional rights

1    pursuant to <u>Bruton v. United States</u>, 391 U.S. 123 (1968) and <u>Crawford v. Washington</u>, 541 U.S.

2    36 (2004).[3]

3        Because the California Supreme Court summarily denied the petition, this Court looks

4    through to the Fifth District Court of Appeal's last reasoned decision.  (Lodged Doc. No. 9.)  <u>Ylst</u>

5    <u>v. Nunnemaker</u>, 501 U.S. at 804-05 & n. 3.

6        The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal

7    prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

8    him." U.S. Const. am. VI.  The Sixth Amendment's Confrontation Clause was made applicable to

9    the states through the Due Process Clause of the Fourteenth Amendment.  <u>Pointer v. Texas</u>, 380

10   U.S. 400, 403-05 (1965). In <u>Bruton v. United States</u>, 391 U.S. 123 (1968), the Supreme Court

11   held that a defendant is deprived of his constitutional rights under the Confrontation Clause of

12   the Sixth Amendment when a non-testifying co-defendant's confession "expressly implicating"

13   the defendant is introduced at their joint trial, even where the jury has been given a limiting

14   instruction.

15       However, Bruton's scope was limited by <u>Richardson v. Marsh</u>, 481 U.S. 200, 211 (1987),

16   in which the Supreme Court held that the admission of a non-testifying co-defendant's confession

17   does not violate the Confrontation Clause when a proper limiting instruction is given and "the

18   confession [is] not incriminating on its face [but becomes] so only when linked with evidence

19   introduced later at trial." In <u>Richardson</u>, the Court held that admission of a non-testifying co-

20   defendant's confession did not violate the defendant's right under Confrontation Clause where the

21   court instructed the jury not to use the confession in any way against the defendant, and the

22   confession was redacted to eliminate not only the defendant's name, but any reference to his

23   existence. <u>Id</u>. at 211. Moreover, not all extrajudicial statements or confessions need be excluded

24   from use at trial.  Rather, "only those statements that 'clearly inculpate' the defendant or are

25   'powerfully incriminating' implicate the 'Bruton' rule." <u>United States v. Yarbrough</u>, 852 F.2d

26   1522, 1537 (9th Cir.1988), *quoting* <u>Richardson</u>, 481 U.S. at 200.

27

28       [3]  Because these claims are so closely related, this Court, as did the state court, will address them
     simultaneously.

In rejecting Petitioner's claim of a <u>Burton</u> violation, the Court of Appeal held in relevant part:

> In the present case, in contrast to the typical situation in which a *Bruton* claim arises (see, e.g. *Gray v. Maryland* (1998) 523 U.S. 185, 192; *Richardson v. Marsh* (1987) 481 U.S. 200, 208; *People v. Fletcher* (1996) 13 Cal.4th 451, 458-459), the jury never knew that the source of the extrajudicial statement-that [Petitioner] was a member of the East Side Crips-was codefendant Stafford. Although jurors obviously were not told to disregard the testimony insofar as [Petitioner] was concerned, they were told they could not consider the statement for the truth of the matter contained therein.  In light of the redaction of the source of the statement, does this case fall within *Bruton's* "narrow exception" to the "almost invariable assumption of the law that jurors follow their instructions"? (*Richardson v. Marsh*, *supra*, 481 U.S. at pp. 206-207.)  Stated another way, since jurors were unaware that the source of Paslay's information was the nontestifying codefendant, and were not simultaneously considering the statement against Stafford while trying to put it out of mind as to [Petitioner], can we assume they followed the limiting instruction given by the trial court? [fn] (See *ibid*. & cases cited therein.)

(Lodged Doc. No. 9, at 22-23.)

The Court of Appeal found, in the alternative, that any such error was harmless in light of the context in which the statement was presented and the other evidence supporting the gang enhancement.  (<u>Id</u>. at 23.)  The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

First, as stated by the Court of Appeal, the redacted version of the statement, deleting the source i.e. Petitioner's codefendant, that Petitioner was a member of the East Side Crips does not implicate the concerns expressed in <u>Bruton</u>.  For all the jury knew the information came from any one of the several members of the East Side Crip gang.[4]  Although Petitioner was tried jointly with co-defendant Stafford (who made the statement to Officer Paslay that Petitioner was a member of the East Side Crips gang), the statement as redacted did not present the concern as expressed in <u>Bruton</u> because the redaction of Stafford's name prevented the jury from having to consider the statement against Stafford while trying to eliminate it as to Petitioner. <u>See Richardson v. Marsh</u>, 481 U.S. at 206-207.  As such, it is reasonable to presume that the jury followed the limiting instruction given by the trial court that this statement was used only as a

---

[4] Officer Paslay stated that as of the time of the commitment offense, i.e. August 25, 2003, there were approximately three hundred members of the East Side Crips gang.  (RT 1343.)

one of bases upon which Officer Paslay's formed his opinion that Petitioner was a member of the

East Side Crips gang, and not the truth of the matter.  (RT 1380-1381.)

Second, as just mentioned, the statement that Petitioner was a member of the East Side

Crips was not offered for the truth of the matter.  Rather, as previously stated it was offered as

one of the bases upon which Officer Paslay formed his opinion regarding Petitioner's

membership in the gang.  The jury was specifically instructed that the statement was not offered

for the truth of the matter. (See 1380-1381) ("Members [of] the jury, you have and will hearing

Officer Paslay refer to various hearsay sources when rendering opinions in this case.  Those

sources may include, but are not limited to, police reports, field interview cards, jail booking

records, probation reports, and statements by and conversations with people outside of this trial.

[¶] The sources are not offered for, and the jury may not consider them, for the truth of the matter

stated within them.  They are only offered for or offered to the extent they form the basis of this

particular expert's opinion or conclusion that he gives to you.").

Lastly, even if the statement was admitted in violation of the rule announced in Bruton

and its progeny, any error was harmless.  At trial, Officer Paslay testified that although he did not

have any prior contacts with Petitioner, through the paperwork he reviewed including, booking

reports, interview cards, prior police reports, and the circumstances surrounding the commitment

offense, he concluded that Petitioner was a member of the East Side Crip gang.[5]  (See RT 1518-

1531.)  This information included the following, when Petitioner was booked into jail for the

instant offenses he claimed membership of the East Side Crips gang (RT 1519); on September 9,

1989, an undercover Deputy purchased several pieces of crack cocaine from Petitioner in a East

Side Crips territory (RT 1519-1520); on March 3, 1995, Petitioner told his then girlfriend that he

was going to bring a shipment of narcotics to her apartment and when she protested he assaulted

her and was later arrested (RT 1520-1521)[6]; on October 4, 1998, Petitioner was present at

Sharky's bar which was notorious for problem involving gang members including drive-by

---

[5] Officer Paslay was designated as a gang expert witness. (See RT 1332-1335.)

[6] In addition to others, one of the primary activities of the East Side Crips gang is narcotics sales.  (RT 1348, 1503.)

11

1    shootings, after Petitioner attempted to break up a fight between two females he was later

2    assaulted by a group of Black males wearing red shirts indicative of members of the rival Blood

3    gang (RT 1521-1522); Petitioner lives in the neighborhood territory of the East Side Crips; and,

4    immediately following the shooting of Leon Anderson, a known leader of the East Side Crips,

5    Petitioner and Strafford got into the car and pursued the shooter in retaliation for the shooting of

6    Anderson demonstrating the show of force and strength in support of the East Side Crips gang

7    (RT 1524-1525).  As stated by Officer Paslay, the fact that in August 2003, another unidentified

8    member of the East Side Crips stated that Petitioner was also a member, was just one more piece

9    of the puzzle in making his determination that Petitioner was a member of that gang.  (See RT

10   1522-1523.)  Based on the foregoing, the state courts' determination of this issue was not

11   contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

12          In denying Petitioner's Crawford claim, the Court of Appeal found Crawford inapplicable

13   because the subject statement was not admitted for the truth of the matter, but rather as one of the

14   bases upon which Officer Paslay formed his expert opinion regarding Petitioner's membership in

15   the East Side Crips gang.  This finding was not contrary to or an unreasonable application of

16   Crawford.  A statement is simply not hearsay testimony if it is not offered for the truth of the

17   matter asserted therein.  Therefore, as correctly found by the Court of Appeal, Crawford by its

18   own terms is limited to testimonial statements offered only for the truth of the matter.  See

19   Crawford, 541 U.S. at 51 ("Testimony . . . is typically a solemn declaration or affirmation made

20   for the purpose of establishing or proving some fact."); see also Tennessee v. Street, 471 U.S.

21   409, 414 (1985); Cal. Evid. Code § 1200(a) ("'Hearsay evidence' is evidence of a statement that

22   was made other than by a witness while testifying at the hearing and that is offered to prove the

23   truth of the matter stated.").  In any event, even if the statement was admitted in violation of

24   Crawford, for the reasons explained above it was harmless in light of the other independent

25   evidence of Petitioner's gang membership.  See Forn v. Hornung, 343 F.3d 990, 999 (9th Cir.

26   2003), quoting Brecht, 507 U.S. at 637-638 and Delaware v. Van Arsdall, 475 U.S. 673, 680

27   (1986) (Confrontation clause errors are subject to harmless error review under Brecht, i.e.,

28   whether the error had a "substantial and injurious effect or influence in determining the jury's

1    verdict.").

2    D.    Gang Expert Testimony by Officer Paslay

3         In Grounds Three and Four, Petitioner contends that Officer Paslay provided improper

4    opinion regarding Petitioner's subjective knowledge and intent and "improper gang profile"

5    evidence in violation of his federal constitutional rights.[7]  Petitioner contends that Paslay

6    expressed his opinion that Petitioner subjectively intended to retaliate against Bayne after the

7    shooting on Feliz.  The essence of Petitioner's claim is that the testimony of Officer Paslay

8    amounted to an improper opinion of how the case should be decided and interfered with the

9    factfinding role of the jury.

10        Because the California Supreme Court summarily denied the petition, this Court looks

11   through to the Fifth District Court of Appeal's last reasoned decision.  (Lodged Doc. No. 9.)  Ylst

12   v. Nunnemaker, 501 U.S. at 804-05 & n. 3.

13        Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a

14   federal habeas corpus proceeding. Estelle, 112 S.Ct. at 477; Middleton v. Cupp, 768 F.2d 1083,

15   1085 (9th Cir.), cert. denied, 478 U.S. 1021 (1985).  Nevertheless, there can be habeas relief for

16   the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a

17   denial of due process. Estelle, 112 S.Ct. at 482; Pulley v. Harris, 465 U.S. 37, 41, 104 S.Ct. 871,

18   874 (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d

19   1180, 1192 (9th Cir. 1993), cert. denied, 510 U.S. 1191, 114 S.Ct. 1294 (1994); Gordon v. Duran,

20   895 F.2d 610, 613 (9th Cir.1990).  However, the failure to comply with state rules of evidence

21   alone is neither a necessary nor a sufficient basis for granting federal habeas relief on due process

22   grounds.  Jammal v. Van de Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991).  Only if there are no

23   permissible inferences that the jury may draw from the evidence can its admission rise to the

24   level of a due process violation.  Id. at 920.

25        California Evidence Code section 801 provides: "If a witness is testifying as an expert,

26   his testimony in the form of an opinion is limited to such an opinion as is:

27   _____

28        [7] Because these claims are so closely related, this Court, as did the state court, will address them
     simultaneously.

> (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and
>
> (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion.

The California Supreme Court has determined that expert testimony regarding the attributes of gang membership is admissible if the probative value in establishing motive, intent, or identity outweighs the potential inflammatory or prejudicial effect of such evidence. See People v. Williams, 16 Cal.4th 153 (1997); see also People v. Gardeley, 14 Cal.4th 605 (1996).

Petitioner was charged with a gang enhancement pursuant to California Penal Code section 186.22, subsection (b)(1) which states:

> Except as provided in paragraphs (4) and (5), any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted . . . .

In denying Petitioner's claim on direct appeal, the Court of Appeal concluded, after discussing and applying at length the applicable state law, that Paslay's testimony related only to motive and not merely subjective intent or knowledge. (Lodged Doc. No. 9, at 32.) Petitioner has failed to demonstrate relief under § 2254, as the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

As stated by the Court of Appeal, the prosecution merely asked Officer Paslay the hypothetical question based on the evidence presented at trial, and assuming that those facts as stated were true, if it was his opinion that the crimes were committed in furtherance of, for the benefit of, or in association with, the East Side Crips criminal street gang. Officer Paslay opined that it was stating, "The shooting occurred immediately after one of the members, specifically Leon Anderson, or a - - I'm sorry, a gang leader was shot. The East Side Crip members pursue the County Boy Crip for - - to try to find him or catch up with him and end up recontacting him there, four blocks away. At which time, they then begin shooting at him, both in retaliation for

1   shooting[.]" (RT 1573.)  Here, as stated by the Court of Appeal, the evidence of Petitioner's

2   involvement in the East Side Crips gang was properly admitted to prove that the motive for

3   discharging of a firearm offense on August 25, 2003, was in retaliation for an earlier shooting

4   that took place against the East Side Crips by the County Boy Crips gang.  The motive of

5   retaliation, as well as participation in and furtherance of the gang were central to the

6   prosecution's proof in this case, and did not "lead only to impermissible inferences about the

7   defendant's character." See Windham v. Merkle, 163 F.3d 1092, 1104 (9th Cir. 1998); United

8   States v. Abel, 469 U.S. 45, 49 (1984) (gang evidence admissible to show bias); United States v.

9   Santiago, 46 F.3d 885, 889 (9th Cir. 1995) (recognizing that gang evidence is admissible to prove

10  motive); People v. Gonzalez, 126 Cal.App.4th 1539, 1550 (2005) (expert testimony is widely

11  accepted if offered to show the motivation for the crime, in general retaliation or intimidation,

12  and whether and how the crime was committed to benefit or promote a gang); People v. Olguin,

13  31 Cal.App.4th 1355, 1369-1370 (1994) (same) .  As such, the presentation of the challenged

14  evidence did not "fatally infect" the trial so as to render the proceeding fundamentally unfair.

15  See Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991) (only if no permissible inferences

16  can be drawn from admitted evidence will due process be violated); Pike v. Dickson, 323 F.2d

17  856, 860 (9th Cir. 1963).  Consequently, no due process violation occurred, and the state courts'

18  determination of this issue was not contrary to, or an unreasonable application of, clearly

19  established Supreme Court precedent.

20          Petitioner further contends that Paslay "presented impermissible gang profile evidence by

21  testifying to what he considered to be the characteristics of gangs and gang members including,

22  what gang members supposedly would know or intend if they were involved in an offense with

23  the characteristics outlined in the prosecutor's hypothetical questions."  (Petition, Memorandum

24  at 27.)  With respect to this claim, the Court of Appeal held, in pertinent part, as follows:

25              In his briefs on appeal, [Petitioner] describes Paslay's testimony in such a
            manner as to make it appear to be nothing more than improper profile evidence.
26          Our reading of the record convinces us that this is a mischaracterization of the
            evidence.  Instead, we find the bulk of the challenged evidence to fall within the
27          type of expert testimony, relating to gang sociology and psychology and
            connecting particular gang characteristics to the facts of this case, which is
28          permitted . . . .

(Lodged Docs. No. 9, at 36-37.)

When a gang enhancement is alleged, expert testimony is admissible on the culture, habits, and psychology of the gang, because those subjects are "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Ca. Evid. Code § 801, subd. (a)); People v. Olguin, 31 Cal.App.4th 1355, 1370 (1994). As stated by the Court of Appeal, Officer Paslay's expert testimony which formed the basis of his opinions properly related to gang sociology and psychology, and was beyond the common experience of the jury. (See RT 1338-1360.) Accordingly, Petitioner has not and cannot demonstrate that the challenged evidence "fatally infected" the trial so as to render the proceeding fundamentally unfair. See Jammal v. Van de Kamp, 926 F.2d at 919 (only if no permissible inferences can be drawn from admitted evidence will due process be violated); Pike v. Dickson, 323 F.2d at 860.

E.      Sixth Amendment Violation - Imposition of Upper Term

Petitioner contends that the trial court's imposition of the upper-term sentence violated the rule announced in Blakely v. sWashington, 542 U.S. 296 (2004), because the aggravating factors were neither found by the jury nor admitted by Petitioner.

Petitioner presented this claim on direct appeal to the California Court of Appeal; however, the Fifth District Court of Appeal reversed Petitioner's assault with a deadly weapon conviction (count one), and declined to the present Blakely claim, stating that it could be raised upon resentencing following remand. (Lodged Doc. No. 9 at 26-27.) The California Supreme Court denied the petition for review, without comment on November 16, 2005. (Lodged Doc. No. 11.) Upon remand, Petitioner was sentenced to the upper term of seven year on Count Three and the upper term on Count Four was stayed. (Lodged Doc. 12.)

The court looks to the last reasoned state court decision as to the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002) (citing Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991)). Where, as here, the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

As previously stated herein, following a jury trial, Petitioner was convicted of assault with a deadly weapon, discharging a firearm from a vehicle, and being a felon in possession of a firearm. (CT 209-210.) On direct appeal, the assault with a deadly weapon offense was reversed and dismissed as it is a lesser, necessarily included offense of discharging a firearm from a vehicle. (Lodged Doc. No. 9, at 10-11.)

On remand and resentencing, Petitioner was sentenced to a total term of twelve years, calculated as follows: upper term of seven years for count three (Cal Penal Code § 12034(c)) and five years for the gang enhancement (Cal. Penal Code § 186.22(b)(1). The execution of the upper term on count four (Cal. Penal Code § 12021(a)(1) was stayed. (Lodged Doc. No. 12.) Upon resentencing, the trial court apparently reimposed its prior findings of no mitigating factors and several aggravating factors including the following: (1) The crime involved violence and the threat of great bodily harm; (2) petitioner engaged in violent conduct demonstrating a serious danger to society; (3) petitioner had suffered two prior misdemeanor convictions pursuant to section 245(a); (4) petition's prior convictions as an adult were numerous; (5) petitioner has served two prior prison terms; (6) petitioner was on probation at the time of the commitment offense; and (7) petitioner's prior performance on probation and/or parole were unsatisfactory. (RT 2711.)

In Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000), the Supreme Court overturned a sentencing scheme that allowed a state judge to enhance a defendant's penalty beyond the prescribed statutory maximum upon finding, by a preponderance of the evidence, that the defendant "acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation, or ethnicity." Apprendi v. New Jersey, 530 U.S. at 469. The Supreme Court reversed, holding that "any fact that increases the penalty for a crime *beyond the prescribed statutory maximum* must be submitted to jury, and proved beyond a reasonable doubt." Id. at 490. (Emphasis added.)

In Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531 (2004), the Court explained that the "statutory maximum" for *Apprendi* purposes is the "maximum" sentence a judge may impose solely on the basis of facts reflected in the jury verdict or admitted by the defendant. In other

1    words, the relevant "statutory maximum " is not the maximum sentence a judge may impose

2    after finding additional facts, but the maximum he may impose without any additional facts." Id.

3    at 303-304.

4         In both Apprendi and Blakely, state law established an ordinary sentencing range for the

5    crime the defendant was convicted of committing, but allowed the court to impose a sentence in

6    excess of that range if it determined the existence of specified facts not intrinsic to the crime.  In

7    each case the Supreme Court held that a sentence in excess of the ordinary range was

8    unconstitutional because it was based on facts that were not admitted by defendant or found true

9    by the jury beyond a reasonable doubt.

10        In United States v. Booker, 543 U.S. 220, 125 S. Ct. 788 (2005), the Court applied its

11   holding in Blakely to the Federal Sentencing Guidelines, finding the Guidelines unconstitutional.

12   In reforming the Guidelines, the Court stated "If the Guidelines as currently written could be read

13   as merely advisory provisions that recommended, rather than required, the selection of particular

14   sentences in response to differing sets of facts, their use would not implicate the Sixth

15   Amendment.  We have never doubted the authority of a judge to exercise broad discretion in

16   imposing a sentence within a statutory range." Id. at 233.  "For when a trial judge exercises his

17   discretion to select a specific sentence within a defined range, the defendant has no right to a jury

18   determination of the facts that the judge deems relevant."  Id.

19        In People v. Black, 35 Cal. 4th 1238 (June 20, 2005), the California Supreme Court held

20   that California's Determinative Sentencing Law satisfied federal constitutional law as follows:

21   "Blakely and Booker established a constitutionally significant distinction between a sentencing

22   scheme that permits judges to engage in the type of judicial fact finding typically and

23   traditionally involved in the exercise of judicial discretion employed in selecting a sentence from

24   within the range prescribed for an offense, and a sentencing scheme that assigns to judges the

25   type of fact-finding role traditionally exercised by juries in determining the existence or

26   nonexistence of elements of an offense."  People v. Black, 35 Cal.4th at 1253.  "[I]n operation

27   and effect, the provisions of the California determinate sentence law simply authorize a

28   sentencing court to engage in the type of fact-finding that traditionally has been incident to the

judge's selection of an appropriate sentence within a statutorily prescribed sentencing range." <u>Id.</u> at 1254.  The Court held that the "presumptive" midterm does nothing more than establish a "reasonableness" constraint on an otherwise wholly discretionary sentencing choice akin to that which the United States Supreme Court has deemed constitutional.  <u>Id.</u> at 1261.

Most recently, in <u>Cunningham v. California</u>, __ U.S. __, 127 S.Ct. 856 (2007), the Supreme Court overruled the holding in <u>Black</u>, and held that the middle term in California's determinate sentencing law was the relevant statutory maximum for the purpose of applying <u>Blakely</u> and <u>Apprendi</u>.  <u>Id.</u> at 868.  Specifically, the Court held that imposing the upper sentence violated the defendant's Sixth and Fourteenth Amendment right to a jury trial because it "assigns to the trial judge, not the jury, authority to find facts that expose a defendant to an elevated 'upper term' sentence."  <u>Id.</u> at 860.

Because the state court's decision was issued prior to <u>Cunningham</u>, the issue becomes whether that decision should be applied retroactively to Petitioner on collateral review, which has not yet been addressed by the Ninth Circuit Court of Appeals.  For the reasons discussed *infra*, this Court, like several other district courts, finds in the negative.

In <u>Teague v. Lane</u>, 489 U.S. 288, 109 S.Ct. 1060 (1986), the Supreme Court held that "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced."  <u>Teague</u>, 489 U.S. at 310.  A new rule is one which "breaks new ground or imposes a new obligation on the States or the Federal Government;" in other words, a new rule is one where "the result was not dictated by precedent existing at the time of the defendant's conviction became final."  <u>Teague</u>, 489 U.S. at 301; <u>Snook v. Wood</u>, 89 F.3d 605, 612 (9th Cir. 1996).

A <u>Teague</u> analysis requires the Court to engage in a three step process.  First, the Court must determine the date the petitioner's conviction became final.  <u>See</u> <u>Caspari v. Bohlen</u>, 510 U.S. 383, 390, 114 S.Ct. 948, 953-954 (1994); <u>Snook</u>, 89 F.3d at 612.  Second, the Court must survey the legal landscape as it existed when the petitioner's conviction became final and determine whether a state court considering the petitioner's claim at that time would have felt compelled by existing precedent to conclude the new rule was required by the Constitution.

Caspari, 510 U.S. at 390; Saffle v. Parks, 494 U.S. 484, 488 110 S.Ct. 1257, 1260 (1990).  Third, if the Court determines that the petitioner seeks the benefit of new rule, the Court must consider whether the relief sought falls within one of the two narrow exceptions to non-retroactivity.  See Gilmore v. Taylor, 508 U.S. 333, 345, 113 S.Ct. 2112, 2119 (1993).  The two narrow exceptions are (1) "the rule places a class of private conduct beyond the power of the State to proscribe . . . or addresses a substantive categorical guarante[d] accorded by the Constitution;" or (2) the rule announces a "watershed rule[ ] of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding."  Graham, 506 U.S. at 477-78, 113 S.Ct. 892, 903 (internal quotations omitted).  The first exception only applies to rules that place certain private "individual conduct beyond the power of the criminal law-making authority to proscribe." Teague, 489 U.S., at 307.  The second exception applies to watershed rules, which are those rules that are "central to an accurate determination of innocence or  guilt."  Teague, 489 U.S. at 313, 109 S.Ct. 1060.  Watershed rules of criminal procedure implicate "the fundamental fairness and accuracy of the criminal proceeding,"  Saffle, 494 U.S. at 495;  Teague, 489 U.S. at 311, and are the small core of rules that require procedures which are implicit in the concept of ordered liberty.  Graham, 506 U.S. at 478, 113 S.Ct. at 903.

First, neither Apprendi, Blakely, or Booker, have been applied retroactively.  Sanchez-Cervantes, 282 F.3d 664, 666-667 (9th Cir. 2002); Schardt v. Payne, 414 F.3d 1025 (9th Cir. 2005); United States v. Cruz, 423 F.3d 1119, 1121 (9th Cir. 2005).  This being so, it appears highly unlikely that Cunningham would be applied retroactively.  This finding is supported by several district courts that have addressed the issue.  See e.g. Fennen v. Nakayema, 494 F.Supp.2d 1148, 2007 WL 1742339 (E.D. Cal., June 14, 2007); Rosales v. Horel, 2007 WL 1852186 (S.D. Cal., June 26, 2007); Salerno v. Schriro, 2007 WL 2153584 (D. Ariz., July 24, 2007).

As was the case in Blakely, Cunningham shifted the decision-making authority from the judge to the jury to determine any facts which may increase a defendant's sentence, such determination is a procedural rather than substantive rule.  Further, a mere change in the law as to the decision-making authority regarding factual findings bearing on a sentence enhancement is

not a watershed rule in criminal procedure. See Schardt, 414 F.3d at 1036.

To the extent Petitioner may argue that Blakely was decided before his conviction became final, and Cunningham is merely an extension of the holding in Blakely and should be applied to the cases that were not final prior to the decision in Blakely, such argument is not persuasive.  To make that determination, this Court would have to find that the holding in Cunningham was dictated by Blakely.  The Cunningham decision was a six-member majority opinion.  Justices Alito, Kennedy, and Breyer, filed a dissenting opinion, reasoning that Apprendi should not be extended to California's determinate sentencing law, because the sentencing scheme was indistinguishable from the *advisory* Guideline scheme approved of in Booker.[8]  Justice Alito, writing for the dissent stated that "the Booker Court unanimously agreed that judicial factfinding under a purely advisory guidelines system would [] comport with the Sixth Amendment." Cunningham, 127 S.Ct. at 874.  It was noted that "the California law gives a judge at least as much sentencing discretion as does the post-Booker federal scheme." Id. at 877. "The California scheme-like the federal 'advisory Guidelines'-does require that this discretion be exercised reasonably." Id. at 878.

In light of the split and strong dissent in the Cunningham decision, it simply cannot be said that the result in Cunningham was dictated by Blakely.  Even though the holding in Blakely was the central reasoning in support of the majority opinion in Cunningham, mere application of a prior decision is not equivalent to being "dictated by precedent."  A new rule is defined as "a rule that ... was not 'dictated by precedent existing at the time the defendant's conviction became final.'" Whorton v. Bockting, __ U.S. __, 127 S.Ct. 1173, 1181 (2007).  In light of the fact that three justices found that California's sentencing scheme was more akin to the advisory Guidelines of which Booker approved, this Court finds that "reasonable jurists" could find the same.  See e.g. Whorton v. Bockting, 127 S.Ct. at 1181.

Next, the issue becomes whether the state courts' determination of this issue was

---

[8] Justices Kennedy and Breyer also believed that Apprendi could be applied to only sentencing enhancements based on the nature of offense (jury determination) and not the nature of the offender (judicial determination).  127 S.Ct. at 872-873.

contrary to, or an unreasonable application of Supreme Court authority.  As just stated, the

imposition of the upper-term was based, in part, on Petitioner's prior convictions.  Although in

Cunningham, the Supreme Court invalidated California's upper-term sentencing scheme based

on facts not found by the jury, it specifically acknowledged, as it did in prior cases, that sentences

based on a defendant's prior convictions does not violate the Sixth Amendment.  Cunningham,

127 S.Ct. At 860, 864, 868; accord Blakely, 542 U.S. at 301; Apprendi, 530 U.S. at 490;

Almendarez-Torres v. United States, 523 U.S. 224 (1998).  To this end, the trial court found that

the upper-term was warranted based, in part, on the facts that Petitioner's prior convictions as an

adult were numerous, he had served two prior prison terms, was on five grants of misdemeanor

probation at the time of the offense, and his prior performance on probation or parole was

unsatisfactory in that he had re-offended throughout every grant of probation afford to him and

while on parole.  (RT 2711.)

As Respondent correctly submits, the United States Supreme Court has never defined the

scope of the prior conviction exception; however, circuit case law supports the finding that it is

reasonable to conclude that this exception includes the type of judicial findings made by the trial

court in this case.[9]  To illustrate, the Second Circuit Court of Appeals, has held that the prior

conviction exception includes "not only the mere fact of previous convictions but other related

issues as well.  Judges frequently must make factual determinations for sentencing, so it is hardly

anomalous to require that they also determinate the 'who, what, when, and where' of a prior

conviction."  United States v. Santiago, 268 F.3d 151, 156 (2d Cir. 2001); see United States v.

Fagans, 406 F.3d 138, 141-142 (2d Cir. 2005) ("the type and length of a sentence imposed seem

logically to fall within this exception.") The Eighth Circuit Court of Appeals has determined that

the prior conviction exception applies to "sentencing-related circumstances of recidivism,"

stating "that it is entirely appropriate for judges to have 'the task of finding not only the mere fact

of previous convictions but other related issues as well.'" United States v. Kempis-Bonola, 287

F.3d 699, 703 (8th Cir. 2002).  In addition, the Tenth Circuit Court of Appeals has stated that "the

---

[9]  Out-of-circuit federal and state appellate court decisions are helpful in determining the reasonableness of
a particular state court adjudication.  LaJoie v. Thompson, 217 F.3d 663, 669 n.6 (9th Cir. 2000),

1   'prior conviction' exception extends to 'subsidiary findings' such as whether a defendant was

2   under court supervision when he or she committed a subsequent crime."  United States v.

3   Corchado, 427 F.3d 815, 820 (10th Cir. 2005).

4         In addition, several state courts, including the California Supreme Court have likewise

5   found that the prior conviction exception includes the type of finding as was made in the instant

6   case.  More specifically, the California Supreme Court has noted that the exception includes

7   more than the mere fact of a prior conviction and includes such matters as the sentence imposed

8   and the status and timing of the incarceration in relation to the subsequent offenses.  People v.

9   McGee, 38 Cal.4th 682, 700-703 (2006) (citing with approval People v. Thomas, 91 Cal.App.4th

10  212, 221-222 (2001)); see also State v. Stewart, 791 A.2d 143, 151-152 (Md. 2002) (prior

11  conviction exception "is not limited solely to prior convictions.  The general rule is that there is

12  no right to a jury trial on matters related to the broader issue of recidivism.").  The Supreme

13  Courts of Washington, Connecticut, Indiana, and Minnesota have all held that the exception may

14  include a determination of whether the defendant was on probation at the time of the current

15  offense.  See State v. Jones, 149 P.3d 636, 640-641 (Wash. 2006); State v. Fagan, 905 A.2d

16  1101, 1121 (Conn. 2006); Ryle v. States, 842 N.E.2d 320, 323-325 (Ind. 2005); State v. Allen,

17  706 N.W.2d 40, 47-48 (Minn. 2005).

18        Moreover, in California, "[a] single aggravating factor is sufficient to impose an

19  aggravated upper prison term where the aggravating factor outweighs the cumulative effect of all

20  mitigating factors. . . ."  People v. Nevill, 167 Cal.App.3d 198, 202 (1985); see also People v.

21  Black, 41 Cal.4th 799, 806 (2007).  Here, the state courts' determination of this issue was not

22  contrary to, or an unreasonable application of, clearly established Supreme Court precedent, as

23  the trial court's imposition of the upper term was properly based, in part, on Petitioner's

24  recidivism, and Petitioner was not entitled to a jury trial on such findings.

25        Furthermore, even if there was error under Blakely, Petitioner has not established the

26  requisite harm.  Blakely errors are subject to harmless error analysis as it is not considered to be a

27  structural error.  Washington v. Recuenco, 548 U.S. 212, 126 S.Ct. 2546 (2006).  In a habeas

28  corpus proceeding, the proper standard of review is that announced in Brecht v. Abrahamson,

507 U.S. 619, 623 (1993), whether the error had a "substantial and injurious effect."  This is so, regardless of whether the state appellate court recognized the error and reviewed it for harmless under the "beyond a reasonable doubt" standard of <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967).  <u>Fry v. Pliler</u>, __ U.S. __, 127 S.Ct 2321, 2325-2327 (2007).  Because only one aggravating factor need be found to impose the upper term sentence, the error is harmless if the jury could have found, at a minimum, at least one of the aggravating circumstances true beyond a reasonable doubt.

Here, any error was harmless as the imposition of the upper term was based on uncontested or overwhelming evidence of Petitioner's recidivism.  It was undisputed that Petitioner had a lengthy criminal history, as the probation report reflects two drug offenses, two prior assault offenses, and a battery offense.  (Lodged Doc. No. 27, at 3.)  He had previously performed unsatisfactorily on parole or probation and served two prior prison terms.  In addition, he was on probation or parole at the time of the commitment offense.  (RT 2711.)  Accordingly, there was ample evidence for the jury to render a verdict beyond a reasonable doubt on the above recidivist circumstances, any one of which would have authorized the imposition of the upper term.  This is particularly so, given the lack of any mitigating factors and the strong overwhelming evidence supporting the recidivist factors in aggravation.  Based on the foregoing, the Court finds that any error was harmless under <u>Brecht</u>, and the claim should be denied.

ORDER

Based on the foregoing, it is HEREBY ORDERED that:

1.      The instant petition for writ of habeas corpus is DENIED;

2.      The Clerk of Court is directed to enter judgment in favor of Respondent; and,

3.      The court declines to issue a Certificate of Appealability.  28 U.S.C. § 2253(c);
        <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000) (a COA should be granted where
        the applicant has made "a substantial showing of the denial of a constitutional
        right," i.e., when "reasonable jurists would find the district court's assessment of
        the constitutional claims debatable or wrong"; <u>Hoffman v. Arave</u>, 455 F.3d 926,
        943 (9th Cir. 2006) (same).  In the present case, the Court finds that reasonable

jurists would not find it debatable that the state courts' decision denying

Petitioner's petition for writ of habeas corpus were not "objectively

unreasonable."

IT IS SO ORDERED.

**Dated:**   **February 8, 2008**              **/s/ Dennis L. Beck**
                                      UNITED STATES MAGISTRATE JUDGE